Good morning. May it please the Court, David Ducro on behalf of the appellant, Lyndon Imsande-Sexton. We're asking you to reverse the district court's determination denying our motion for summary judgment and granting the internationals. I just wanted to briefly touch on our claims and address the primary defense here, which is the administrative appeal, the exhaustion of the internal remedy. And then I would gladly answer any questions or concerns from the Court. Could you, in your course of the argument, you make much of the fact of your client having been assured by the local or the international representative, I guess, that she didn't need to appeal and then her appeal time lapsed and ultimately what seems to have happened is that the internationals simply relied on the first suspension. You don't make any, I'm not sure you tie any of your claims to the advice or the disputed advice given. So, you know, I'm sort of left at sea why you're spending so much time on it. So it may be during the course of your argument you could articulate what it's relevant to. Well, there isn't much relevance to our claims from the appeal and the advice that she got from Mr. Benenix. Our claims are based primarily on the actions of Mr. Gordon. The retaliation claim for her speech, 101A2, goes to primarily James Gordon's actions in acting as both the fact-finder and judge, also for ratifying and authorizing the actions of the local. This claim, the retaliation claim, does not require a finding of discipline, although here that is the practical effect is that she was disciplined, and the effect here is to suppress dissent. Ms. Sexton was a very vocal, outspoken critic of both the local and the next step up, the district. The district court did find that there was protected speech and that there was an adverse action. What the court did not find was the third element, which was the nexus between the two, primarily because of the lapse of time. The lapse of time here is more than you see in many retaliation cases, but our point is that Mr. Gordon retaliated as soon as he possibly could under the appeal and under the circumstances of this case. He had no opportunity. Yes, sir. Counsel, I've got a question for you, and I may be obtuse on this issue, but I'm trying to see how it is that Gordon was retaliating if Gordon relied on what the local did and the lack of appeal. What action did Gordon take that was not based on what the local union had done, which she didn't appeal? Well, several things. After finding probable cause, he then recommended that there not be a trial, so he deprived the appellant of a trial on what was essentially those second charges, and instead he imposed the discipline. Okay, I understand that. But if he didn't give her a trial on the second charges about disregarding the prior order, but said that he didn't need a trial because she hadn't appealed, then what's the problem with that? Well, the problem with that is, aside from denying her a trial, the appeal is not a jurisdictional prerequisite. It can be waived. She had been going through the process for quite a long time. She is only required to exhaust any internal remedies for a period of four months, and she had gone well beyond that. Exhaustion under Section 101A4 is permissive. It's not jurisdictional. And he also ignored the incorrectness of the second issue, which is the Sarmiento matter, which the Sarmiento complaint, and a number of other defenses that Ms. Sexton could have raised in a trial if he had granted her one. So the retaliation is in not granting her a trial to allow her to present the defenses, and that's also the due process violation. Withrow v. Larkin and the Wildberger cases talk about the problem of having the prosecutor act as the judge, which is the case here, and this is exactly the kind of harm which can result from that situation, where someone is denied the opportunity to present to a neutral fact finder her reasons for not appealing, the steps that she did take prior to that, you know, this lengthy discussion, this ongoing discussion she had by Mr. Venegas not to appeal. Counsel, I'm sorry. Excuse me. I have to go one step further than Judge Gould. My colleague says that he may be obtuse. I must be way beyond that point. I'm going to take it to a district court level, I guess, then, if you'll pardon the expression. But here you have an individual who was a vice president of the union, who obviously has a great deal of experience in union activities, engages, allegedly, in certain conduct that requires her or eventually she loses her position and is suspended. Even while she's suspended, she is elected to be president by the members. So we're not talking about an unsophisticated individual when it comes to union activities and procedures and processes with respect to a hearing. She elects for whatever reason to not pursue the remedy of appeal at the first level. She elects not to follow the findings at that first level. And because she elects not to remove herself, it then goes to international. International is not, and you were saying that they're having a trial there, but my question is, is it really a separate trial or is it really a review of the initial action taken by the local organization? And whether or not she appealed or not with Finnegas, that's a real issue, a question of fact, potentially. But you're referring to this as the second trial. And I'm not certain if that's really what it is or it's just a review of the process that took place at the local level. Why is it a trial, I guess, is my question at the second level. Well, she would want a trial to present the deficiencies from the Sarmiento complaint, which she alleges is invalid. It was late. It wasn't filed timely. She didn't get notice of it. It wasn't on the agenda. What Gordon did is he said that there was no problem with the Sarmiento appeal. Now, on January 21st is when the Sarmiento matter was heard by the local. Three days later, my client is told by Barbara Easterling from the international, you know, this matter is over, you are the president, only the international can remove you. You know, she also had faxed a copy of an appeal to Mr. Finnegas. You talk about her being a sophisticated, you know, a sophisticated person in union matters. She had faxed her appeal to Mr. Finnegas, and he said, just hold on to it, the international is going to take care of it, which is consistent with her belief. It wasn't follow the Constitution. Pardon me? Or did he say follow the Constitution, follow the rules and regulations on this? Is that? Well, he told her various things at various times, but one of the things he told her was that the international is handling this. Stay in your seat. And then after a certain amount of time, he said, it's a dead issue. So how does that, I think that's what's confusing me, too. The international, at the outset, is, as you say, keeping the status quo, isn't taking any adverse actions, says let's process go out, and then they ultimately, I think they find what there's no probable cause on the Sarmiento, but in any event, they don't take it all the way, because they say, well, she's, you know, her suspension was valid on the first one. She's never appealed it. So that's what they relied upon. So you said at the first opportunity, why couldn't they have retaliated right at the outset then from the get-go instead of telling her to stay in place? Because at that point, there was really nothing valid before then. It wasn't until Ms. Hinton's second charges, I believe in April, March or April, where the allegation was that she was improperly holding the office, relying back on these two other matters, the Sarmiento complaint and the, well, the Sarmiento complaint, saying that because of, according to Ms. Hinton, that because that was valid, Ms. Sexton was improperly holding the union office. And that's when something was properly before the international, which they could act on. They assigned it to Mr. Gordon, about whom Ms. Sexton had been critical in the past. And, you know, as a result, he found probable cause, yet no trial. If there are no questions, I deserve my remaining time. Okay. Thank you. Good morning, Your Honors. Michael Feinberg for the International Union and the other international union appellees. Before I commence, I wanted to ask, because there is an appeal and a cross-appeal I'm not trying to get more time than I'm entitled to, but... You won't. No problem. Is there a surrebuttal or do I just, is this my shot? This is your shot. Thank you. But I won't reserve time. I'll just go ahead. Unless the Court wishes otherwise, I'd like to commence by addressing our cross-appeal concerning the union's motion to dismiss on failure to exhaust grounds. Because if the Court rules that the motion to dismiss should have been granted, then we never get to the summary judgment motion at all. The first question is whether a motion to dismiss on exhaustion grounds must be filed within the 20-day time period that would apply to other 12b motions. We start with RITSA, which this Court found that the defense's failure to exhaust nonjudicial remedies is properly brought as an unenumerated 12b motion rather than a motion for summary judgment. District courts, however, went a step further and held, we believe erroneously, that a motion to dismiss an LMRDA claim on the ground that plaintiff failed to exhaust her internal union appeals procedures must be filed before a responsive pleading is filed. What the RITSA Court specifically held was that the defense's failure to exhaust internal union appeals procedures should be raised in a motion to dismiss, quote, or be treated as such if raised in a motion for summary judgment. Now, inherently, that means that such a defense need not be raised before the responsive pleading is filed. Well, let's suppose the district court erred in that regard. Nonetheless, the district court then went forward with the compensating analysis and said, well, you know, there was no viable appeal at the time this was filed. Therefore, why don't you do that? Because if the district court's right on that, do we need to decide the first motion? You're right. The district court, having ruled it was untimely, nonetheless addressed the merits of our motion. And remember that Cass and Pang adopts the Clayton analysis, this three-prong test. So the first test, first question is whether the union officials are so hostile to her, to the plaintiff from the Sexton, that she couldn't have hoped to obtain a fair hearing. There wasn't any evidence of that. Because the decision-makers are so removed back in Washington, she doesn't have any relationship with them to show any bias or that there would have been futility or hostility in that regard. The second question is whether she could have obtained complete relief. And it's in that area that this question of whether the remedy should remain open forever, essentially, needs to be addressed. The third question is whether there would have been an unreasonable delay. And I believe that we adequately showed to the district court that she could have gotten complete relief at least at one of the levels of the appeals procedures within four months. So here we have the district court construing Clayton and Cass and Pang to require that the internal union appeals procedures remain available to her, to the appellant, or proposed appellant, at the time she files the lawsuit. They're available to her at the time of the events. That is, at the time the local takes its action to suspend her from membership and remove her from office. She has a time period in which to file that appeal. She chooses not to do so. For the court to say, no, that makes it unavailable to her, means that the union is not entitled to have any time limits at all for filing an appeal. They have to keep this issue open, essentially, indefinitely. There's no law on that at all, anywhere. We've researched this carefully. Now, as it turns out, Your Honor, Judge Fischer, you took in the Wyatt v. Terhoon case, you took the Witson concept and applied it in the Prison Litigation Reform Act. Right. Right. There are cases that hold that if you miss the deadline there, and this is an exhaustion situation, you lose out. It's not open forever. There's a deadline set by Congress for filing your internal appeals. You use those appeals or you waive those appeals. Conceptually, this is the same situation. Unions are entitled to regulate their own internal affairs as long as the rules are reasonable. A time period, and no one argued, by the way, in the district court, that the time period for filing an internal union appeal was unreasonable, the 30-day period. That's a common time period throughout union constitutions. No one argued against it. The UAW cases involving exhaustion, Clayton-type cases and the ones out of the Fifth Circuit, all have time limits. If you miss them, you lose. Those cases have been upheld. What we have here is a situation where the plaintiff, the appellant, simply chose not to file that appeal and thus waived her rights. The union is not required to keep that opportunity to appeal open indefinitely. Well, what do you make of Kampusang's alternative remand to the district court in that case? Well, I don't think the United Circuit had a sufficient record on what would have happened. So they remanded to the district court, goes down to the district court, and what happens there is that the lawyers for the union say no. What about what happened? What was the assumption in Kampusang? The assumption was that it would still be open. Or if it wasn't. Well, they don't actually say what would happen if it wasn't still open. So should the district court determine that the grievance procedures maintained by Local 142 do not satisfy the standards articulated, it may not compel Kassambang to exhaust union remedies as a prerequisite to entertaining the suit under Title I. I think in that situation. That is, if they are still open on remand. And if they're not, then that's not going to be jurisdictional to the district court. If that is what Kassambang holds as opposed to. I'm not clear that that's a holding or that I realize that that's a directive to the district court. What happens in the district court, however, is something completely different. Because, in fact, the remedies were gone. And in order to simply resolve the problem, the lawyers for the union say, well, we'll make those remedies available. And they waive their time limits. So it's never really addressed. And never comes back up to the Ninth Circuit to see what happens if, in fact, those remedies were no longer available to them. Well, when it says it may not compel the district court, may not compel Kassambang to exhaust union remedies if they're not available when they go back on remand, then it can't be a prerequisite to entertaining a suit under Title I. Then with all due respect to the Ninth Circuit. Well, that's the one we have to give respect to, too. Well, I understand. But you're in the Ninth Circuit, too. So we've been reminded. I'm not asking you to reverse Kassambang. But to the extent that that might be the holding of Kassambang, that the opening, the opportunity to have a suit. If it is the holding, what you're saying is we're bound by it. I'm sorry? If it is the holding, if we construe it as the holding, then we're bound by it. This panel is bound by it. I would like to ask this panel, then, to make a change in that law because it does not make sense. Counsel, if I can make a question for you. Sure. If I may, please. Now, maybe I'm still being obtuse, but it seems to me that if that's the law in Kaposang, you know, our panel can't make any change. You would have to get a change from an NBank panel. We're not allowed to disregard former precedent. So in that sense, if that's your argument, it's not a good use of your time with us. All right. Because it can't go anywhere. Now, let me mention another point. I don't quite get whether we even have to get into your exhaustion cross appeal if we were to reject, if we decided to reject the appeal of Amandi Sexton. It seems to me those issues don't really have a practical significance. So I would hope before your last five minutes is up, you would talk a little bit about whether she was denied a fair hearing, like a statutory process right, whether there was retaliation. And if not, why not? Very good. In other words, I'd like to hear you comment on the issues that we have to grapple with. Very good. I will address those. First, in questioning of appellant's counsel, the court asked why. The court questioned what had happened on January 24th, I think it was, 2003, when the international had this phone conversation with plaintiff and left her in place. What happened there was the locals had already acted to remove her from office. Under the Constitution, she could have been removed from office that day, the 21st of January, and then had filed for appeal. The international, not wanting to create havoc, there was havoc already going on at the local hall that day, not wanting to have havoc going on there, says you stay in office. Only the international can remove you, with the idea being that she would be filing an appeal, because that appeal would come to the international, and if they ruled in her favor, the international then would leave her in place, would put her back in place, or if the international ruled against her, the international would be removing her. So it's in that sense that the international was acting. It doesn't show any bias against her. In fact, if anything, it shows that they're trying to be of assistance to her. Mr. Gordon, who was an international union representative, could not retaliate against the plaintiff legally, because he didn't have any authority to do anything. All he did, his authority was limited to making a recommendation. The recommendation goes on to the international president, who has to approve it. The international president then receives the recommendation and approves it or disapproves it. In this case, international president Barr receives the recommendation from Mr. Gordon. He then acts on that recommendation and says, look, there's nothing before me in the way of an appeal. This case should have been appealed months ago. It hasn't been appealed months ago. Now, I can't do anything for Ms. Sexton because she didn't do anything for herself. The local's action has become final, and so I need to have the local now take the steps that it is required to do. And so he directs the assistant to the international vice president, Mr. Weitkamp, to tell the local, go ahead, do what you need to do, and then they remove her from office. Gordon doesn't remove her from office. Gordon does an investigation and issues a report. There isn't even any evidence that Gordon had any motive to retaliate against her, even if it is 21 months after she speaks out at an international meeting. She speaks out at an international meeting at District 9 where she allegedly criticizes Mr. Gordon, but there's no evidence that Mr. Gordon cared about her, responded to her. She said he was offended and was rude and insulting to her, that he was annoyed by a question a year later, and that Tony Bixler, a District 9 vice president, stared me down and appeared upset at my questioning the actions of District 9 officials. Well, you don't have to. He stared her down and appeared upset. I mean, if international union representatives were to take every comment that is made by every member, that's disgruntled. Well, he said there was no evidence. Well, it's not evidence, I think, of bias on his part, and certainly it's 21 months apart from the acts of July 2003. So we don't feel that there's any basis for connecting that up. There is no nexus between her alleged expressions of union opinion and the events that occur at the time of her removal. She's given all the due process the international can give her. She doesn't like the decision of the international president. She files an appeal for the international president. It goes to the international executive committee. It goes to the international executive board. It goes to the international convention where thousands of people gather, hear her appeal and rule against her. She's given all the due process the international union can give her, given that she did not file an appeal from the locals' action. There's no ratification here. There's no approval of the locals' action. They had no choice jurisdictionally but to say the locals removed you. You have to leave. Okay. We have your argument. Thank you. Thank you. I think there's one important fact about the appeal issue, and that is the January 21 events, the Sarmiento complaint. The section did not have standing to appeal that. The complaint was against the local. It wasn't against her. So under the IAP, which governs these appeals, she did not have standing. I think they argued on the Sarmiento complaint. What about the first appeal? Isn't that what counsel was talking about? Her own suspension. Well, her own suspension, she appealed and she won in November. The first trial panel imposed disciplinary. She appealed that to the membership and she won. So effectively twice she was voted into office. For the Sarmiento one, the one in January, which we say was untimely, that's the one. It was a complaint against the local, not against her. So she would not have standing for that. A comment that counsel made was that on the January 24, 2003, phone call from Barbara Easterling, the secretary to the president of the International, Ms. Easterling recommended that plaintiff do nothing or that the appellant do nothing. Counsel said the idea being that she would be filing an appeal. There was absolutely nothing in the record to indicate that. There was no idea that she would be filing an appeal. All of the evidence is to the contrary. Mr. Venegas told her over and over not to file one. He did nothing with the draft. That was facts to her. When you say she didn't have standing, why, since the, as I, now I'm trying to recall, that reinstated, the Sarmiento aspect reinstated her suspension, did it not? Effectively, yes. But what it did first was to overturn the vote of the membership from November. It was a complaint against the membership. Right. It wasn't about something that Ms. Sexton had done. It was a complaint, so she didn't have standing to go against that motion, which didn't pass, because it wasn't a complaint against her. She had exhausted her appeals when she went to the membership, to the membership meeting in November of 2002, and won, overwhelmingly. That's the... Counsel, counsel. Yes. When it gets turned around in the membership based on the Sarmiento complaint, then they reverse, the local reverses its view on that. Doesn't she have a right to appeal then? No, she doesn't. The local is the party that's the subject of the complaint. Now, I know the argument was made it could be treated as something, but it's not a complaint against her for which there is an appeal process, as the first Hinton charges were, for example. But if it reinstates the earlier decision adverse to her, doesn't she have the ability then to appeal the decision that was made adverse to her? There's no mechanism for that. She had already done that. So really when they reverse the vote of the membership and reinstate the trial panel decision, there's no mechanism for her to appeal. And that was part of what was going on in the few days subsequent to January 21 of 2003, was the confusion of what was this? This wasn't a complaint against me. It was a complaint against the local. But it reinstated something else, and I appealed that and won. So where do we go from here? And there really wasn't somewhere to go. You know, this is the kind of situation that calls out for equitable application of 101A4, which is permissive. It says the person may appeal. Well, and that that appeal can only take up to four months before she's entitled to go to court. Well, this took well over four months. Because of the uncertainty of whether she even had standing to appeal, I think the permissive aspect of it should be invoked and it should be answered negatively, that she did not have to appeal. Finally, I just wanted to say that there was some talk about this matter being debated at the international conference. And the point I wanted to make was that the debate is not a substitute for the due process, which led up to that point through Gordon and through the Sarmiento motion in November. Okay. Thank you very much. Thank you. All right. The case argued is submitted, and we thank the counsel for your argument.
judges: Fisher, Gould, England